Botsford, J.
INTRODUCTION
The plaintiff, the Town of Natick (town) filed this motion for summary judgment on two counts of its complaint. The counts allege that the defendant, Modern Continental Construction, dba Marino Lookout Farm (Modern), is in substance operating a restaurant for members of the public on its farm premises in violation of zoning requirements (Count IV) and without a common victualler’s license (Count I). Modern has filed a cross-motion for summary judgment. The motions present no disputed issues of fact.
On -the zoning count (Count IV), the determinative issue is whether Modern’s activities are protected by G.L.c. 40A, §3, which exempts the activities of agricultural operations from zoning and special permit requirements provided certain conditions are met. For the reasons discussed below, Modem’s cross-motion for summary judgment on Count IV will be allowed. As to the town’s common victualler’s license claim under G.L.c. 140, §2 (Count I), the summary judgment motion of each side will be allowed in part and denied in part.
BACKGROUND
Modern owns and runs Marino Lookout Farm and Market (Lookout Farm), a 110 acre farm located at 89 Pleasant Street in Natick. The property is located in a residential zoning district, and is subject to an agricultural preservation restriction. Lookout Farm has been in continuous agricultural use for over 300 years. Modern purchased Lookout Farm in 1991, when the farm was in receivership. Since then, Modem has undertaken ambitious plans to improve and expand the farm’s operations. Modem has planted new orchards with over 60,000 apple trees and 10,000 pear trees; many varieties of strawberry, raspberry, blackberry and blueberry plants; grape vines; and other fruits and vegetables. Modern has also built greenhouses, installed irrigation systems and brought to the farm an impressive array of livestock and poultry.
Of Lookout Farm’s 110 acres, approximately 60 acres are devoted to orchards, 10 acres to vegetable fields, 10 acres to animal pasture, and 10 acres to roads and structures; the remaining acreage lies fallow. The farm grows a range of produce, including apples, pears, peaches, plums, melons, strawberries, lettuce, cucumbers, squash, onions, pumpkins, peppers, and herbs.[2] Lookout Farm also raises chickens, goats, pigs, lamb, deer, ostrich, and buffalo, and it harvests eggs. The agricultural products are sold at Lookout Farm as well as to other retailers and to Ristorante Marino in Cambridge, a separate entity owned and operated by a sister corporation.
Modern operates on Lookout Farm a year-round farmstand and market (farmstand), a seasonal “U-pick” business (U-pick) with an associated pavilion where food is also sold, and is building a slaughterhouse.[3] It also holds some agricultural “festivals” in the spring, summer, and fall.
The Farmstand: The farmstand is located close to the entrance to Lookout Farm on Pleasant Street. It sells Lookout Farm poultry, eggs, farm produce — vegetables and fruits — and items processed from that produce, such as cider, gelato, mustards, jams and salsas. Once the slaughterhouse is operational, presumably lamb, pork and other meats will also be sold. In addition to Lookout Farm items, the farmstand also sells a number of nonfarm items: dairy products, ice *525 cream, bakery goods such as pies and breads, deli meats and other processed meat products, sandwiches, and coffee and tea. The total farmstand sales for 1997 (through October) were $641,183, of which $59,027 consisted of miscellaneous food, and $120,903 was gelato. The farmstand does not presently contain any seating, but the addition of ten picnic tables with a seating capacity of up to 35 people has been proposed.
The greenhouses and garden center, which are now part of the farmstand market complex, sell fertilizer and other gardening-related items.
A concession cart selling hot dogs, popcorn and soft drinks was used at Lookout Farm in conjunction with a spring festival in May 1996. The record does not make clear whether it has ever been used again.
The Pavilion: The pavilion is a 40 foot by 80 foot structure situated in the orchards, approximately one-half mile from the public road. The pavilion is open seasonally, from May into October. It serves as the center for Lookout Farm’s U Pick program (where members of the public may pick their own fruits and vegetables). It also appears to be a primary site during the farm’s seasonal festivals. At the festivals and during the U Pick season, Modern serves hot dogs, hamburgers, sausages, pizza, gelato, pastries, soft drinks, and snacks at the pavilion. The present structure contains a wood burning grill and oven, a rotisserie, and approximately six to eight picnic tables. A proposed addition to the pavilion would add two more woodburning grill/ovens, restroom facilities (16 stalls), and additional picnic tables and benches for increased seating, up to 35 people. The proposed cooking facilities would be used to prepare chicken, hamburgers, hot dogs, corn on the cob and other grilled foods: also offered would be pies, croissants and beverages including hot apple cider. Modern also plans to build, or has built, a new cider press building next to the pavilion where apple cider would be prepared and demonstrations performed.
The Agricultural Festivals: In 1996 and perhaps before, Lookout Farm hosted a “Spring Fest” in late May, featuring wood carving demonstrations, musical guests, a children’s tent with games and clowns, amusements including pony rides, hayrides, and a horse show, food, and gardening demonstrations: it has also hosted a “Harvest Moon Pow-Wow and Festival” in one or more fall seasons featuring “native singing,” dancing, drumming, hayrides, children’s activities, apple picking, food, and live animals such as a deer herd, a buffalo herd, sheep, ostrich, and llama. There is no fee to enter these festivals.
The U-pick. The U-pick is open during times when there are fruits and vegetables ready to be picked. The public is welcome and no entrance fee is required. Apple picking is emphasized, but during the summer visitors may pick other fruits and vegetables. Customers may also tour the farm and view the live animals and other farm operations.
The Agricultural Preservation Restriction: Lookout Farm has been subject to an agricultural preservation restriction (APR) since 1980. The APR prohibits the construction or placing of buildings or structures on Lookout Farm except for agricultural purposes. It does, however, provide for the construction of permanent structures for “agriculturally related retail sales or of other agriculturally related commercial purposes.” It appears that Modem has sought and has now received approval to amend the APR to permit additions to the pavilion and the farmstand.
Since 1992, the town’s board of health has issued Modern a food service permit to operate a “retail food establishment” at Lookout Farm. A permit was in effect at the time this action was brought. In 1995 or 1996, the town informed Modem that it also needed a common victualler’s license in order to serve prepared food at Lookout Farm. Modem applied to the town for common victualler’s licenses for both the farmstand and the pavilion, without waiving the right to contest the license requirement. After a public hearing on May 6, 1996, the board of selectmen denied a license as to each location.
Following the license denials, Modern continued to maintain it was not obliged to have a common victualler’s license in order to carry on its food service activities at the farmstand and the pavilion. The town then commenced this suit seeking to enjoin Modem from carrying on these activities in violation of applicable zoning requirements and without a common victualler’s license.[4]
DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). Mass.R.Civ.P. 56(c). Because the record before me reveals no disputed factual issues of a material nature,[5] the case may properly be resolved by summary judgment.
1. The Town’s Zoning Claim; the Agricultural Use Exemption.
General Laws c. 40A, §3 (§3) provides in relevant part:
No zoning ordinance or by-law shall . . . prohibit, unreasonably regulate or require a special permit for the use of land for the primary purpose of agriculture, horticulture, floriculture or viticulture; nor prohibit or unreasonably regulate, or require a special permit for the use, expansion or reconstruction of existing structures thereon for the primary use of agriculture, horticulture, floriculture or viti *526 culture, including those facilities for the sale of produce and wine and dairy products, provided that during the months of June, July, August, and September of every year, the majority of such products for sale, based on either gross sales dollars or volume, have been produced by the owner of the land on which the facility is located . . .
“The obvious purpose of the Act ... is to promote agricultural use within all zoning districts in a municipality.” Building Inspector of Mansfield v. Curvin, 22 Mass.App.Ct. 401, 402-03 (1986). See Cumberland Farms of Conn, Inc. v. Zoning Bd. of Appeal of N. Attleboro, 359 Mass. 68, 74 (1971). The agricultural use exemption embodied in §3 is interpreted broadly in order to promote the economic viability of agricultural enterprises in Massachusetts. See Tisbury v. Martha’s Vineyard Comm. 27 Mass.App.Ct. 1204, 1205 (1989). Where the agricultural use exemption applies, the exemption is “complete and unconditional . . . [and] is not limited to agricultural uses that do not injure a residential neighborhood . . . [V]arious uses indubitably to be classed as agricultural may be detrimental to a residential neighborhood.” Moulton v. Building Inspector of Milton, 312 Mass. 195, 197 (1942). The exemption operates even where the agricultural use in question is retail or commercial in nature. See Prime v. Zoning Board of Appeals of Norwell, 42 Mass.App.Ct. 796, 800 (1997) (“[T]he abutter’s] suggestion is that a ‘retail’ operation is inconsistent with the agricultural use of land, and therefore not within §3. The argument has been answered . . . ‘All agriculture conducted for profit is commercial in some degree’ ”), quoting Cumberland Farms of Conn., Inc., supra, 359 Mass. at 76.
Applying the foregoing principles, the courts have interpreted the language of §3 to permit the sale of foods as “agricultural products”:
The fact that the products are not in their natural state does not mean that they cease to be products raised on the farm of their owner, who seeks there to sell them . . . We do not believe that one who on his premises processes milk and cream from cows on his premises thereby ceases to be a farmer, selling on his farm products they raise.
Deutschmann v. Board of Appeals of Canton, 325 Mass. 297, 301 (1950). Accord, Parrish v. Board of Appeal of Sharon, 351 Mass. 561, 566 (1967). See Modern Continental Constr. Co. v. Building Inspector of Natick, 42 Mass.App.Ct. 901 (1997) (slaughterhouse used for butchery of animals raised on premises is agricultural use); Von Jess v. Board of Appeals of Littleton, Land Court, Misc. Case No. 142973, Jan 4, 1991, slip op. at 11-16 (hereinafter von Jess) (baked goods are agricultural products so long as they contain a fruit component). The sale of fertilizer and mulch products related to a greenhouse and nursery are also deemed agricultural products. See Tisbury v. Martha’s Vineyard Comm., supra, 27 Mass.App.Ct. at 1205.
In 1982, the scope of §3 was significantly expanded by the addition of the “fifty percent rule.” Before the fifty percent rule, nonfarm-owned products were not afforded statutory protection. See, e.g., Parrish, supra, 351 Mass. at 566-67 (dairy farmer not permitted to sell fruit punch at ice cream stand). With the addition of the fifty percent rule, all sales of farm owned and nonfarm owned agricultural products are permitted as of right throughout the calendar year so long as more than fifty percent of the sales during the primary harvest season are of the farm owner’s products. See Eastham v. Clancy, 44 Mass.App.Ct. 901, 902 (1997) (party seeking agricultural use exemption must show that majority of products for sale during primary harvest season are produced by him); von Jess, supra, slip op. at 15 (“[T]he sale of products related to the four protected categories [agriculture, horticulture, floriculture or viticulture] need reflect fifty percent production by the owner of the land . . . only during the months of June, July, August and September. In the remaining eight months the products may be obtained elsewhere so long as they are agricultural, horticultural, floricultural or viticultural in nature”). In determining whether a particular nonfarm item may be sold, the inquiry centers on whether the item in question is an agricultural product. See von Jess, supra, slip op. at 15. A farm may sell a different category of agricultural product than the farm itself produces so long as the farm meets the fifty percent rule. See id. In this instance, the town has not argued that Lookout Farm does not satisfy the fifty percent rule; moreover, the amount of acreage under cultivation suggests that such an argument would be futile. On the record before me, the only reasonable inference to draw is that Lookout Farm does satisfy the fifty percent rule.[6]
The town’s principal contention is that §3 does not permit Modem to operate what the town deems to amount to a grocery store and a commercial restaurant in a residential district as of right.[7] In light of the acreage devoted to agricultural and livestock operations, as well as of the general nature of the farm’s business, the primary purpose of Lookout Farm is without question agricultural. Compare Easton v. Clancy, supra, 44 Mass.App.Ct. at 902 (primary purpose of 5.5 acre property not agricultural where slightly less than one third of the premises had been cleared for growing). As stated above, §3 permits Lookout Farm to sell agricultural products as of right. See von Jess, supra, slip op. at 15. Thus the sale of fruits and vegetables, and any prepared or processed foods containing fruits and vegetables — the jams, jellies, salsas, fruit gelato, pies and pastries which Modern offers— even if the fmits and vegetables are not from Lookout Farm, is permissible so long as Modem satisfies the fifty percent rule. See id. The same is true of the dairy products offered, including ice cream, again provided that Modern satisfies, as it currently does, the fifty percent rule. See Deutschmann v. Board of Appeals of Canton, supra, 325 Mass. at 301. Additionally, and *527 with the same provisions, Modem may sell eggs, chicken, meats and meat products derived from its chickens, lambs, pigs, etc. as well as meat products from non-farm sources. See von Jess, supra, slip op. at 15. More problematic are those items such as nonfmit baked goods, breads, coffee and tea. Nevertheless, while not related to produce of Lookout Farm, these all appear to qualify as agricultural products within the meaning of §3. See Prime v. Zoning Bd. Of Appeals of Norwell, supra, 42 Mass.App.Ct. at 800.[8] The evident purpose of adding the fifty percent rule to the statute was to promote the economic viability of farm-owned farmstands. Accordingly, agricultural products should be interpreted broadly. See Modern Continental Constr. Co., Inc. v. Building Inspector of Natick, supra 42 Mass.App.Ct. at 902; Tisbury v. Martha’s Vineyard Comm., supra, 27 Mass.App.Ct. at 1205. Nothing in the language of §3 requires the courts to micromanage the shelves of local farmstands in general or Modern’s in particular. Finally, the record demonstrates that the food service offered at both the farmstand and the pavilion, with a major focus of the service being farm-produced foods, are related and incidental to Lookout Farm’s agricultural operations at both sites, viz., the sale of farm-grown and farm-raised produce and products, and the U-pick activities. See Tisbury v. Marth’s Vineyard Comm., supra, 27 Mass.App.Ct. at 1205-06. Compare Henry v. Board of Appeals of Dunstable, 418 Mass. 841, 844-47 (1994) (proposed excavation and removal of gravel from five-acre portion of 39-acre lot to help area suitable for cultivating Christmas trees was not agricultural nor incidental to an agricultural use, but rather qualified as an independent commercial quarrying project).
In sum, the sale of food and the food services which Modern offers at the farmstand and the pavilion are protected acüvies under §3.[9] That said, however, §3 only provides an exemption from the town’s zoning requirements; it provides no exemption for licenses of any kind. The question remains, therefore, whether Modern is required to obtain one or more common victualler’s licenses in connection with its food service operations.
2. The Town’s Common Victualler’s License Claim[10]
The issuance of the common victualler’s license is governed by G.L.c. 140, §2, which provides that “licensing authorities may grant licenses to persons to be innholders or common victuallers.” The statute does not define the term “common victualler," but it has been interpreted, “by long usage,” to mean “the keeper of a restaurant or public eating house.” Commonwealth v. Meckel, 221 Mass. 70, 72 (1915). Accord, Liggett Drug Co., Inc. v. License Comm’rs of North Adams, 296 Mass. 41, 49 (1936). Moreover, a common victualler at all times is required to be “provided with suitable food for strangers and travelers!,]’’ and to have on the “premises the necessary implements and facilities for cooking, preparing and serving food for strangers and travelers!.]” G.L.c. 140, §§5, 6. What these statutory provisions and cases indicate, therefore, is that the term “common victualler” refers to one who operates a restaurant-like facility where food is prepared and then offered to the public to be eaten on the premises. See Liggett Drug Co., Inc., supra, 296 Mass. at 51 (describing common victualler’s business as “[t]he sale of food for immediate consumption on the premises of the vendor . . .”).
The farmstand. The record indicates that Modern’s current operation at its farmstand consists of selling a variety of produce and prepared food — e,g., gelato, sandwiches, ice cream, drinks — for take-out purposes. At the present time, there appear to be no seating facilities inside or outside the farmstand.[11] At the pavilion at the approximate center of the property, there are grills, ovens and seating, and plans to increase both the cooking facilities and seating.
As the discussion of §3 above reveals, I consider the sale of items such as prepared foods and even of hot foods such as steamed hot dogs for take-out consumption as incidental to the agricultural use of the property, so long as Marino continues to meet the fifty percent rule. While food is sold at the farmstand on a year-round basis, Modern does not offer at that location any facility for on-premises consumption, and there is no evidence that the food is offered in a way that calls for or invites the buyer to eat it on the premises — for example, selling a plate of hot food accompanied by eating utensils and napkin. In these circumstances, Modem cannot be said to be operating the farmstand as a “common victualler.” Cf. Deutschmann v. Board of Appeals of Canton, supra, 325 Mass. at 299, 300 (sale of milk in cartons and in paper cups, milk shakes, ice cream and cheese from plaintiffs roadside stand was permissible under bylaw allowing sale of products raised on farms from roadside stands; no discussion of need for common victualler’s license). Cf. also Parrish v. Board of Appeal of Sharon, supra, 351 Mass. at 562-63, 565-66 (1967) (by-law authorizing structures to be built and used for “[flarm [purposes]...[,] including the sale of products raised on the premises only” would permit construction of farmstand with outside service windows where members of the public could buy ice cream cones, milk shakes, frappes and sundaes made from milk and cream produced on plaintiffs daily farm; no mention of common victualler’s license).[12]
Modern contemplates adding ten picnic tables, with a seating capacity of 35 persons, to its farmstand and market location. It also appears to propose adding a convection oven (price: $3,350) and a “mobile char broiler" (price: $2977). If these changes were made, and the selection of prepared foods offered were increased — again, as apparently contemplated — it is possible perhaps that the food service operation at the farmstand would become one for which a common *528 victualler’s license were required, because of the transition to an operation where a significant portion of the food being offered was cooked or otherwise prepared on the premises for immediate consumption on the premises. See Liggett Drug Co., Inc. v. License Comm’rs of North Adams, supra, 296 Mass. at 45, 49, 51. But this is not the situation at present, and the town may not currently require Modern to obtain a common victualler’s license for the farmstand.
The pavilion. The pavilion is different from the farmstand. Modern offers for sale there grilled and cooked foods including hamburgers, hot dogs and sausages, and a variety of other prepared foods; it also provides seating. With the addition of the new buildings, facilities and food preparation equipment, Modern plans to offer a greater variety of cooked and grilled foods, will have more seating and will be able to provide bathrooms. Because Modern currently cooks and offers prepared food to all members of the public for immediate consumption on the premises at the pavilion, the town is authorized to require Modern to obtain a common victualler’s license for the pavillion.
Modern argues that it does not qualify as a common victualler in connection with its pavilion (or farmstand) operations because the common victualler’s license is only required for those serving food in a building, see G.L.c. 140, §4, as illustrated by the mandate that an applicant for the license submit plans containing the restaurant’s cooking, seating, and restroom facilities, G.L.c. 140, §6. Modern submitted such a plan for the farmstand and pavilion locations.[13] The plans indicate that at present there are quite extensive cooking and seating facilities, almost all of which are housed, and plans to increase these facilities as well as to add restroom facilities. The layout and facilities of the pavilion, even though much of the seating is technically “outside,” in every other respect resemble a restaurant.[14] I do not read the reference to “building” in G.L.c. 140, §4 as narrowly restricting the “premises” (the word used in §6) of the common victualler to an enclosed structure with four walls and a roof.
Modern also contends that it is not a common victualler in connection with the pavilion (and farmstand) because the statutory scheme distinguishes between take-out establishments or sites and full service restaurants. See, e.g., G.L.c. 140, §§47 (coffee and tea houses), 49 (lunch carts). Whatever distinctions may be recognized in G.L.c. 140 among establishments offering food to the public, at the present time, at least with respect to the pavilion, Modern offers cooked and prepared food, a restaurant-like facility and seating, and clearly invites members of the public to eat what they buy right there on the premises. The pavilion does not qualify as a “take out” establishment.
According to Modern, its operations at the pavilion cannot require a common victualler’s license because a common victualler must offer food to all “strangers and travelers,” but the pavilion is a half mile off the public way and will primarily be used by persons at the U pick and the agricultural festivals. I disagree. These activities are open to the general public and thus are available to all “strangers and travelers," even though not located directly on the road. Moreover, while the festivals occur only on a defined date or dates, it seems that the U-pick activities are offered on a continuous or at least regular basis during the summer and fall months when the picking of various fruits and vegetables takes place. The common victualler license statute does not require that the premises subject to the license be open on a daily basis, or for twelve months a year.[15]
ORDER
For the foregoing reasons, the motion of the plaintiff Town of Natick to dismiss Counts II and III of its complaint is allowed. The plaintiffs motion for summary judgment is allowed in part and denied in part as to Count I of its complaint, and denied as to Count IV. The cross-motion for summary judgment of the defendant Modern Continental Construction, d/b/a Marino Lookout Farm, is allowed in part and denied in part as to Count I of the plaintiffs complaint and allowed as to Count IV. Counsel are to communicate with the clerk of the session to arrange for a conference concerning the terms of judgment to be entered in this case.

 For the 1996 growing season, Lookout Farm expected to produce 300,000 pounds of apples, 145,000 pounds of pears, and thousands of pounds of other fruits and vegetables.

 The slaughterhouse is not at issue in this motion. A prior action determined that the slaughterhouse was permissible agricultural activity under G.L.c. 40A, §3. See Modern Continental Construction Co. v. Building Inspector of Natick, 42 Mass.App.Ct. 901 (1997).

 The complaint also alleged violations of the APR and the State Sanitary Code (Counts II and III of the complaint). The town has now moved to dismiss these counts. The motion is allowed.

 Modem argues that if its cross-motion for summary judgment is denied, then the town’s should be as well because the question whether Modern qualifies as a “common victualler" in need of a common victualler’s license is one of fact requiring a trial. I disagree. What is in dispute is not the underlying facts but the legal conclusion to which they lead. In these circumstances summaiy judgment is appropriate.

 Besides the acreage breakdown, the record contains the gross receipts for the farmstand for the first ten months of October 1997, of which approximately 9% was miscellaneous food. This figure also suggests that the majority of the farmstand’s sales during the harvest season were from farm-owned products. Additionally, the farm sells its produce to other retailers and operates the U-pick. Taken together, these facts support the inference that the percentage of non-farm products sold by the entire Lookout Farm operation during the harvest season is significantly less than 50%.

 To the extent the town complains that Modern’s food service operations constitute a commercial enterprise and as *529 such are undeserving of protection as an agricultural use, the argument clearly fails. See Cumberland Farms of Conn., Inc. v. Zoning Bd. of Appeal of N. Attleborough, 359 Mass. 68, 76 (1971). Accord, Prime v. Zoning Bd. of Appeals of Norwell 42 Mass.App.Ct. 796, 800 (1997).

 I decline to follow the distinction set forth in von Jess, supra, between fruit and nonfruit breads.

 It is not clear whether the town challenges Modem’s right to put on seasonal agricultural festivals themselves or only the food service aspect of those festivals. There do appear to be components of the festivals that would not qualify as “agricultural” or incidental to agricultural use — for example, musical entertainment and amusements for children.

 There is no longer any dispute in this case that Modem has obtained the appropriate permit from the town’s board of health to serve food — in the words of the permit, to operate a retail food service establishment — at both the farmstand and the pavilion. The common victualler’s license at issue is an additional requirement the town argues Modem must satisfy in order to offer prepared foods at Lookout Farm. Modem challenges on the facts presented the town’s claim that its operations are sufficiently restaurant-like to require a common victualler’s license. However, Modern does not appear to disagree that the town may require a person or entity running a facility which does qualify as a restaurant to obtain both a permit from the board of health and a common victualler’s license.

 Marino has announced, but I infer as not yet implemented, a plan to add picnic tables around the ¡farmstand and associated market that would sit up to 35 people. The plan is discussed below.

 In the Parrish case, the court ultimately ruled that the board of appeal could permissibly deny a permit to the plaintiff because he was intending to sell fruit punch along with the ice cream cones, frappes and other prepared dairy product items, and fruit punch was neither from items “raised on the premises,” nor, in the court’s view, incidental to such items. Parrish v. Board of Appeal of Sharon, 351 Mass. 561, 567-568 (1967). This holding is not relevant to this case because §3 with a fifty precent mle is far more broad than the by-law discussed in Parrish, Moreover, Parrish is cited here not for its discussion of the zoning issue but for the point that the roadside farmstand, with its service window offering “take-out" ice cream cones, frappes and milk shakes, did not appear to raise to the parties or the court any questions concerning the plaintiffs possible status as a common victualler.

 Modern submitted the plans while maintaining that it was not required to have a common victualler’s license.

 Some of the seating is within the pavilion, which is a roofed structure, although it does not have enclosing walls.

 However, if the only time Modern offered food services at the pavillion were in connection with a few agricultural festivals each year, I agree that Modem would not be likely to qualify as a common victualler. Modem also suggests that if it were to charge a fee for its agricultural festivals and perhaps also its U pick activities, then it could not be deemed a common victualler. Modem relies on an opinion of the Attorney General for this proposition. See Rep. AG., Pub. Doc. No. 12, (1921), p. 204. There is merit in Modern’s position. If a fee were charged, the provision of prepared food to participants would seem to be an incidental aspect of the fee-generating activity, viz., the fruit-and-vegetable picking endeavor (U pick) or the festival.