Sikora, Mitchell J., J.
RULING
Upon consideration of the complaint, of all motion and opposition materials including affidavits and memoranda of law, and of extensive oral argument at the hearing of March 14, 2006, the court DENIES plaintiff Wellesley’s application for a preliminary injunction prohibiting the opening and operation by the defendants of a Dunkin’ Donuts retail store at 277 Linden Street, Wellesley without licensure by the Town as a common victualler.
REASONING
Factual Background
The following facts emerge from the court papers and oral argument as undisputed. In the course of the reasoning, I will refer to several other important settled facts.
The defendant Javamine, Inc. (“Javamine”) owns and operates several Dunkin’ Donuts retail franchises. The codefendant 277 Linden Street LLC (“Linden”) owns a strip mall in the Town of Wellesley (“the Town”). It has entered a five-year lease with Javamine. Under the lease Javamine will operate a Dunkin’ outlet offering exclusively “take out” food and beverage. The terms of the lease prohibit the sale of food for consumption on the premises. Javamine intends to enforce that provision. The retail store is now prepared to open. It will contain no tables, counters, or chairs.
On December 8, 2005, Linden applied for and received from the Town a building permit for the purpose of a “tenant fit up for Dunkin’ Donuts” at the site. On December 18,2005, Javamine applied for, and subsequently received from the Town Department of Health, a food establishment permit.
The adaptation of the store space is now complete. Javamine has received a certificate of occupancy from the Town Building Department. Javamine reports that it has spent approximately $325,000 upon the build-out of the premises.
On January 3, 2006, a representative of Linden appeared at the meeting of the Town Board of Selectmen. He informed the Selectmen of the lease and the intended opening of the Dunkin’ Donuts outlet at 277 Linden Street. The Selectmen expressed concern about the traffic consequences of the intended new business. They opined also that it would require a common victualler license. On January 4, 2006, they communicated those views formally to Javamine and Linden by letter. In their view, victualler licensure applied to establishments limited to take-out food service. The letter concluded that “the town expects you to file an application for such a license and not to begin operations unless and until a common victualler license issues.” The letter issued from Town Counsel.
In subsequent communications the Town took the position that the new store would require also licensure as a coffee house in accordance with G.L.c. 140, §47.
The record to date indicates that three Dunkin’ Donuts outlets presently do business in Wellesley, that two have facilities for eating and drinking on the premises or in house, and that those outlets do have victualler licenses; and that a third outlet functions as an adjunct operation for take-out service at a gas station without a common victualler license. Javamine and Linden assert also that multiple supermarkets and convenience stores offer take-out food within the Town; and that the municipality has required victualler’s licensure from none of them. Finally it appears to be undisputed that the Town has never required or issued a coffee house license of any kind under G.L.c. 140, §47, since adoption of that authority by the municipality in March of 1918.
In its affidavit materials, the Town emphasizes that the new operation at the 277 Linden Street mall will cause substantial traffic and parking problems, litter, and the likely congregation of adolescents from a nearby junior high school.
Preliminary Injunction Standards
Preliminary injunctive relief is always a matter for sound discretion. However, several well settled criteria have developed to guide that discretion. The leading precedent remains Packaging Industries Group, Inc. v. *13 Cheney, 380 Mass. 609, 616-22 (1980). Under those criteria, an applicant for preliminary injunctive relief must demonstrate (a) a likelihood of success upon the ultimate legal merits of its claim; (b) a threat or presence of actionable or inequitable irreparable harm in the absence of preliminary injunctive assistance; (c) the absence or the lesser degree of harm to the opposing party from the imposition of the requested preliminary injunction; and (d) the significance of a public interest, if any is present in the circumstances of the dispute.
In circumstances in which a governmental agency seeks preliminary injunctive relief in the public interest, that agency need not demonstrate irreparable harm so long as (a) the challenged conduct results in ■violation of the law and (b) the challenged conduct harms or adversely affects a public interest in health, safety, or welfare. Commonwealth v. Mass CRINC, 392 Mass. 79, 89-90 (1984). This corollary of preliminary injunction adjudication will typically apply to efforts by the Attorney General. By logical extension, it may benefit municipal authorities able to satisfy the requirements of demonstrated unlawfulness and harm to the public health, safety, or welfare.
Importantly, the injunction court must consider all these criteria in combination and not in isolation. In the assessment of any harm, detriment, or burden, the court must also ask whether those consequences are actionable or inequitable in light of the governing law of the circumstances. “What matters as to each party is the not raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party, may a preliminary injunction properly issue.” Packaging Industries Group, Inc., 380 Mass. at 617.
I will analyze the parties’ factual and legal submissions under each of these criteria in turn.
I. The Merits
A. The Meaning of Common Victualler: Literal Analyis
The crux of the Town’s position is that the new operation will constitute a “common victualler” within the meaning of G.L.c. 140, §2. In pertinent part that statute includes the following sentences. “Licensing authorities may grant licenses to persons to be inn-holders or common victuallers . . . This section shall not require the licensing authorities to grant either of said licenses if, in their opinion, the public good does not require it.” No statutory definition exists for the term "common victualler.” This provision does derive from legislation of the colonial era. Interpretation of this critical term presents an issue of statutory construction. Several canons should be helpful. We begin with the language of the statute as “the principal source of insight” into legislative intent. Hoffman v. Howmedica, 373 Mass. 32, 37 (1977). If a plain meaning emerges for a disputed statutory term, the court must respect that meaning. It cannot deviate from, or alter, that plain meaning by expedient enlargement or restriction. G.L.c. 4, §6, Third. See especially Commissioner of Correction v. Superior Court, 446 Mass. 123, 124 (2006); Gordon & Son, Inc. v. Alcoholic Beverage Control Commission, 371 Mass. 584, 589 (1976) (authorities collected). See also Casey v. Massachusetts Electric Co., 392 Mass. 876, 880 (1984); Commonwealth v. Gove, 366 Mass. 351, 354 (1974); Franki Foundation Co. v. State Tax Commission, 361 Mass. 614, 617 (1972); and F. Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 543 (1947).
Section 2 presumes knowledge of a plain meaning for the term “common victualler.” It provides no elaboration. However, two related provisions throw strong cross lights upon the term. Section 5 of c. 140 provides, “Every innholder and every common victualler shall at all times be provided with suitable food for strangers and travelers. Every innholder shall also have upon his premises suitable rooms, with beds and bedding for the lodging of his guests.” Section 6 of c. 140 requires an applicant for common victualler licensure to have upon its premises “the necessary implements and facilities for cooking, preparing and serving food for strangers and travelers .. .” In circumstances in which the applicant does not have those means presently in place, it must file with “the licensing authorities a plan showing the location of counters, tables, ranges, toilets and in general the proposed set-up of the premises . . . and of the implements and facilities necessary for cooking, preparing and serving food .. .” The licensing authority may grant the permit to the victualler upon condition of fulfillment of that plan.
The combined provisions of this statutory scheme indicate strongly that a common victualler served food for consumption on the premises. The provisions link the victualler closely with the function of the innkeeper. They contemplate “counters, tables, ranges, [and] toilets” for the stranger or traveler dependent upon the quantity and quality of food available from the licensee. These meanings gather force from historical considerations. The innkeeper and the victualler provided vital support for anyone engaged in a journey of any length.
Canons of statutory construction also permit consultation of established lexicons or dictionaries. Those sources typically list as a recognized meaning of “victualler” the words “tavernkeeper” and “innkeeper.” See Webster’s New Collegiate Dictionary (1956) (2d ed.); and Webster’s Unabridged Dictionary (2d ed.) (1979).
B. Decisional Law
The few decisions directly addressing the meaning the term also define a common victualler as a purveyor of food for consumption on the premises. See Commonwealth v. Meckel, 221 Mass. 70, 72 (1915). “Thewords *14 ‘common victualler’ in Massachusetts, by long usage, have come to mean the keeper of a restaurant or public eating house ... [It must] have ‘upon [its] premises the necessary implements and facilities for cooking, preparing and serving food for strangers and travelers.’ ” (Emphasis supplied.) See also Liggett Drug Co. v. License Commissioners of North Adams, 296 Mass. 41, 51 (1936). In analysis of §2 of c. 140, the court observes “the sale of food for immediate consumption on the premises of the vendor has an intimate relation to the public health.” (Emphasis supplied.) Two more recent Superior Court decisions have reached the same conclusion: that the core element of the concept of common victualler is the provision and accommodation of food for consumption on the premises. See Christy’s Market, Inc. v. City of Medford, Middlesex Superior Court Civil Action 89-780, summary judgment decision precluding municipal licensure authority under the common victualler statute in the case of convenience store offering only take out food. And see especially Town of Natick v. Modern Continental Construction, d/b/a Marino Lookout Farm, 8 Mass. L. Rptr. 524, interior pages 5-7 (March 27, 1998) (an exhaustive analysis by Botsford, J., concluding that victualler licensure applies only to activities of food consumption on the premises of a store or outlet).
C. Wellesley’s Contention
The Town emphasizes one of the pertinent sentences in c. 140, §2: “This section shall not require the licensing authorities to grant [a common victualler’s license] if, in their opinion, the public good does not require it.” It contends that the concept of “public good” operates broadly to permit it to consider such extended factors of public health, safety, and welfare as traffic and parking, litter, and pedestrian congestion. Indeed, certain precedents appear to authorize the municipal victualler licensing authority to expand the range of considerations from traditional concerns for the reliability of the quantity and quality of the food of a particular applicant to broader standards of supply, demand, local sentiment, and local safety objectives. See especially McDonald’s Corporation v. Town of East Longmeadow, 24 Mass.App.Ct. 904, 905-07 (1987). However, decisions of that categoiy rest upon the uncontested premise that the license authority is considering the application of an undoubted common victualler. In other words, the statute confers authority on the municipality only if it satisfies the jurisdictional prerequisite in the first sentence in the provision; only if it is indeed entertaining the application of a common victualler. That condition is the predicate for any licensing authority of the municipality. The later sentence providing expansive authority to serve the “public good” rests upon that predicate. If the predicate missing, so is the licensing authority of the municipality.
In short, the present decision does not deprive the municipality of all authority to address genuine public health, safety, and welfare problems consequent from the introduction of a voluminous business activity within its boundaries. However, as the defendants point out, neither the Town nor a court can distort the plain meaning of a statute in order to confer nonexistent authority upon a local government. The meaning of common victualler cannot stretch to the length proposed by the Town. The Town must derive its authority legitimately from some valid source other than the common victualler licensure provision of G.L.c. 140, §2. The victualler licensure authority cannot function as a covert mechanism for unauthorized ad hoc zoning decisions.
D. Coffee and Tea House Licensure
As an independent source of authority, the town invokes G.L.c. 140, §47. In pertinent part that provision recites that “no coffee house, so called, or tea house, or place of resort for refreshment where the principal business is . . . the sale of coffee or tea . . . shall be maintained . . . until a license therefor has been granted by the licensing authorities.”
The Legislature enacted this provision in 1917. It remains a complete husk. It has generated no decisional law whatsoever. It contains no standards or procedures for implementation. It is undisputed that Wellesley has never before employed the statute for any regulatoiy purpose.
In its opposition, the defendant Javamine explores the meanings of “coffee house,” “teahouse,” and “place of resort.” A survey of well recognized dictionary definitions indicates strongly that the central characteristic of a “coffee house” and “tea house” is the congregation of customers for in-house consumption of beverages and the conduct of social discourse, especially political and artistic discourse in coffee houses and social conversation in tea houses.
Massachusetts decisions, mostly from the nineteenth century, refer to “places of resort” as sites of assembly for gambling, prostitution, and carousing. Defendant Javamine’s opposition, pp. 5-10. Section 47 appears to intend all three locations (coffee house, tea house, place of resort) as sites for the sale of “coffee or tea as a beverage.”
The Town has not persuasively disputed the meanings imputed to these §47 locations by Javamine. I find them to be convincing. The essential feature of the intended coffee house or tea house is the element of congregation. The statute appears to expect individuals to come, to stay, and to consume beverages, as they engage in social, political, and artistic discourse. The take-out facility at 277 Linden Street does not appear to approach that character.
Consequently, under neither §2 (common victualler) nor §47 (coffee house or tea house or place of resort) has the Town established the requisite probability of success upon the ultimate merits of its claim.
*15 II.Irreparable Harm
The Town has identified public health, safety, and welfare concerns of traffic, litter, and pedestrian congestion. It expects those problems to cause some harm or risk of harm. However, it must show that it has authority to address those specific problems by means of its authority for licensure of common victuallers or coffee or tea houses. As we have seen, those sources of statutory authority simply do not apply to a take-out food facility.
The Town urges the court to expand or to update the concept of common victualler and coffee house to encompass fast food take-out operations. However, that quality and quantity of lawmaking belongs more typically and reliably to a legislature, and not to a court. If a steady line of decisions supported the incremental extension of those statutory definitions to fast food take-out operations, a court might take the calibrated next step. However, I find no precedents enlarging the concept of common victualler (or discussing the concept of coffee house at all) beyond the visible boundaries of in-house consumption. The Town is requesting not a definitional next step, but rather a quantum jump.
The Town is, of course, not powerless to combat the perceived dangers of the new store by means of police supervision and safeguards, and possible other zoning and health measures. However, it cannot claim irreparable harm as a result of any licensure failure by the defendants. They have satisfied the existing zoning, building, and health requirements.
III.Countervailing Harm to the Defendant Parties
By contrast, the defendants Javamine and Linden have the benefit of the probable legal merits; and they confront much greater, and for Javamine irreparable, harm. Very simply, denial of licensure under the victualler or coffee house statutes would abort the business, preclude a tenancy, and waste the investment of $325,000. Those consequences are severe. The probable merits do not justify them.
IV.A Public Interest
In cases in which a governmental party seeks to assert or to defend the use of regulatory authority for purposes of public health, safely, or welfare, the analysis of comparative harm addresses the public interest factor. Here the Town has identified several public concerns. However the law invoked by it does not furnish the claimed authority to regulate them. Both are necessary for the requested injunction.
CONCLUSION
For these reasons, the court has DENIED the Town’s application for preliminary injunctive relief.